**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America, Civil No. 01-1435 (DWF/AJB)

Plaintiff,

v.

Mary Dieter, f/k/a Mary Ann McNeal;
Michael K. McNeal; Cory C. McNeal;
Hennepin County Assessor; David Olson;
and Juli Olson;

Defendants;

David Olson and Juli Olson,

Cross-Claimants,

**MEMORANDUM OPINION AND ORDER**

v.

Corey C. McNeal,

Cross-Defendant;

David Olson and Juli Olson,

Third-Party Plaintiffs,

v.

Tina M. O'Tool, John A. Dieter, and
Theresa A. Dieter,

Third-Party Defendants.

---

Michael R. Pahl, Esq., United States Department of Justice, Tax Division, P.O. Box 7238 Ben Franklin Station, Washington, DC 20044, counsel for Plaintiff.

APR 14 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENT'D
DEPUTY CLERK

Mark A. Pridgeon, Esq., Pridgeon Law Office, One Corporate Center, Suite 420, 7301 Ohms Lane, Edina, Minnesota 55439, counsel for Defendants Mary Dieter and Corey C. McNeal.

Robert T. Rudy, Assistant Hennepin County Attorney, A-2000 Government Center, 300 6th Street South, Minneapolis, Minnesota 55487, counsel for Defendant Hennepin County Assessor.

Michael L. Brutlag, Esq., and Ryan J. Trucke, Esq., Brutlag, Hartmann & Okoneski, 1100 Pillsbury Center, 200 6th Street South, Minneapolis, Minnesota 55402, counsel for Defendants David Olson and Juli Olson.

Kristine K. Nogosek, Esq., and Loren M. Solfest, Esq., Severson, Sheldon, Dougherty & Molenda, 7300 West 147th Street, Suite 600, Apple Valley, Minnesota 55124, counsel for Third-Party Defendants Tina M. O'Tool, John A. Dieter, and Theresa A. Dieter.

---

## Introduction

The above-entitled matter is before the undersigned United States District Judge pursuant to Plaintiff United States of America's Motion for Summary Judgment against Defendants Mary Dieter, Corey O'Tool,[1] David Olson, and Juli Olson; Defendants Mary Dieter and Corey O'Tool's Motion for Summary Judgment against the United States of America; David Olson and Juli Olsons' Motion for Summary Judgment against Corey O'Tool, Tina O'Tool, Mary Dieter, John Dieter, and Theresa Dieter; Defendants Corey O'Tool, Tina O'Tool, John Dieter, and Theresa Dieter's Motion for Summary Judgment against David Olson and Juli Olson; and Defendants Corey O'Tool and Mary Dieter's Motion for Summary Judgment against David and Juli Olson.

---

[1] Corey McNeal was born as Corey O'Tool. At the age of six, he was adopted by Michael McNeal and his name changed to Corey McNeal. In 1999, however, he changed his name back to his birth name. For the sake of consistency, the Court will refer to him as Corey O'Tool unless the documents being referred to specifically state otherwise.

For the reasons stated below, the United States of America's Motion for Summary Judgment is granted; Mary Dieter and Corey O'Tool's Motion for Summary Judgment against the United States of America is denied; Mary Dieter and Cory O'Tool's Motion for Summary Judgment against David and Juli Olson is denied; David and Juli Olson's Motion for Summary Judgment against Corey O'Tool, Tina O'Tool, Mary Dieter, John Dieter, and Theresa Dieter is granted in part and denied in part; and Tina O'Tool, John Dieter, and Theresa Dieter's Motion for Summary Judgment against David and Juli Olson is denied; and Corey O'Tool and Mary Dieter's Motion for Summary Judgment against David and Juli Olson is denied.

**Background**

This case arises out of the United States' attempt to satisfy tax assessments against Michael McNeal and Mary Dieter that occurred as a result of a transfer of Michael McNeal's mother's house to Mary Dieter's son, Corey O'Tool. According to the United States, this transfer was made to compensate Mary Dieter and Michael McNeal for services rendered in caring for Michael McNeal's aging mother. The United States asserts that the house was only given to Corey O'Tool to avoid the tax consequences to Mary Dieter and Michael McNeal, and as such, Corey O'Tool held the house as only a nominee for Mary Dieter and Michael McNeal.

The United States requests that the Court reduce these tax assessments to judgment and that the Court order a forced sale of the property to satisfy the judgments. The United States' motion, if granted, could ultimately result in the displacement of David and Juli Olson, the innocent third parties who purchased the home from Corey O'Tool. Consequently, David and Juli Olson bring several claims against Corey O'Tool, Mary Dieter, Tina O'Tool, and John and Theresa Dieter.

## I. Alberta McNeal

Alberta McNeal had two children: a son, Michael McNeal, and a daughter, Maureen McNeal. In 1985, Alberta McNeal lived in Minneapolis, Minnesota, in a house located at 5040 Belmont Avenue (the "Belmont Avenue House"). At that time, Alberta McNeal was experiencing health issues, including symptoms associated with Parkinson's disease, that made it difficult for her to continue living alone. (Mary Dieter Dep. at 19-20.) Alberta McNeal's daughter Maureen had previously cared for her, but that care was becoming more than Maureen, a single parent working full-time, could provide. (Maureen McNeal Dep. at 14.) As a result, Alberta McNeal's family discussed moving Alberta McNeal to a senior-living facility, but decided against it because Alberta McNeal wanted to remain at her home. (Mary Dieter Dep. at 21.) At this time, Alberta McNeal's son, Michael McNeal, and his then-wife, Mary Dieter, were living in Des Moines, Iowa, with their son Michael "Mickey" McNeal, and with Mary's son from a previous marriage, Corey O'Tool. The family agreed that Mary Dieter and her two sons would move to Minneapolis to take care of Alberta McNeal.

Once she arrived in Minneapolis, Mary Dieter's tasks in caring for Alberta McNeal included housekeeping, cooking, doing laundry, driving Alberta McNeal to doctor appointments and various social events, handling Alberta McNeal's financial affairs, and bathing her. (Mary Dieter Dep. at 24-29.) Mary Dieter was not paid for these tasks, although she and her two sons lived rent-free in the Belmont Avenue house, where Alberta provided groceries and paid all of the household expenses. (Mary Dieter Dep. at 22.) During this time, Mary Dieter did not work outside of the home. (Mary Dieter Dep. at 24.)

## II. Purchase of the 12th Avenue House

Into the late 1980's and early 1990, Alberta McNeal's health steadily declined; she was having issues with her memory and had fallen several times. As a result, family members decided that Alberta McNeal should move into a smaller house where she would not need to climb stairs. (Michael McNeal Dep. at 34-35; Mary Dieter Dep. at 64.) Ultimately, in early 1989, Michael McNeal, in his capacity as Power of Attorney for Alberta, signed the documents necessary to sell the Belmont Avenue House and purchased a new house located at 4904-12th Avenue South in Minneapolis (the "12th Avenue House"). Mary Dieter and Michael McNeal were instrumental in selecting the 12th Avenue House, and it appears that Alberta McNeal played no part in its selection. (Mary Dieter Dep. at 69.) In fact, Mary Dieter stated that it was "totally left up to me" as to which house would be selected. (*Id.*) In addition to selecting the home, Michael McNeal and Mary Dieter negotiated the personal property to be conveyed at closing and any changes to be made to the home. (Michael McNeal Dep. at 34; Mary Dieter Dep. at 70-74.) Michael McNeal and Mary Dieter also handled the closing on behalf of Alberta McNeal. (*Id.*)

After Mary McNeal and Alberta McNeal moved into the 12th Avenue House, Alberta's health further declined. On December 12, 1991, Alberta McNeal entered a nursing home, and Mary Dieter and Michael McNeal continued to live in the 12th Avenue House. In late 1992, Alberta McNeal suffered three episodes of congestive heart failure. Ultimately, Alberta McNeal died in December 1993.

## III. Disputes over the Disposal of Alberta McNeal's Assets

While Mary Dieter cared for Alberta McNeal, it appears that it was discussed that Dieter would receive Alberta McNeal's home as compensation for caring for Alberta. In a letter to Alberta McNeal dated February 14, 1988, her attorney, Wheeler Smith, stated:

> Michael and Mary are saying that they are entitled to, or would like to arrange for, more tangible recognition of the services Mary is rendering in taking care of you. They like living in Minneapolis, and they would like to have your homestead property.

(*See* Wheeler Smith Dep., Ex. 2 at 2.) Mary Dieter stated that at "one time Maureen had said that she wanted to make sure that the house . . . would be saved . . . for taking care of Grandma" and that no one objected to the idea that the house would go to her for taking care of Alberta McNeal. (Mary Dieter Dep. at 23-24.) Michael McNeal stated that his mother was present at a meeting where "it was decided and agreed upon that we would be given the Belmont house" as financial compensation for taking care of his Alberta McNeal, and that this was "something that Mary [Dieter] wanted." (Michael Dieter Dep. at 46-51.) Further, Michael McNeal stated that this agreement was made with Maureen McNeal prior to his mother's death. (*Id.* at 49.) Maureen McNeal stated that while there were not any fixed agreements in place as to how Mary Dieter would be compensated, Maureen McNeal was told by Michael McNeal that "Mary should get the house as compensation for taking care of [Alberta McNeal]." (Maureen McNeal Dep. at 15-16, 32-33.)

Mary Dieter and Corey O'Tool assert, however, that there was no fixed agreement or decision among the family members that Michael McNeal and Mary Dieter would receive Alberta McNeal's house as compensation for caring for Alberta. Furthermore, Mary Dieter and

Corey O'Tool contend that Mary Dieter did not expect to be paid for taking care of her mother-in-law, except for the free room and board. (*See id.*)

Alberta McNeal had executed two documents directing how her property would be distributed upon her death: a will and a revocable trust. Alberta McNeal's will, dated March 14, 1989, divided Alberta's property equally between Michael and Maureen McNeal upon Alberta's death. (Michael McNeal Dep., Ex. 8.) The will did not provide that Alberta McNeal's house would be conveyed to any person other than Michael McNeal or Maureen McNeal. By a document dated December 1, 1987, Alberta McNeal created a revocable trust that divided Alberta's property equally between Michael McNeal and Maureen McNeal. (Wheeler Smith Dep., Ex. 1 at 3.) Like Alberta McNeal's will, the trust did not provide that Alberta McNeal's house would be conveyed to any person other than Maureen McNeal or Michael McNeal. The trust further named Michael McNeal as trustee and granted him full Power of Attorney to handle his mother's affairs.

Ultimately, a dispute arose between Maureen McNeal and Michael McNeal as to Michael McNeal's handling of their mother's affairs. In December 1992, Maureen McNeal wrote a letter to her brother accusing him of misappropriating Alberta's assets and requesting clarification of Alberta's financial affairs. (*See* Maureen McNeal Dep. Ex. 2.) In this letter, Maureen McNeal stated that Michael McNeal had "repeatedly spoken of wanting financial compensation for the service [he had] rendered to Mother" and that Michael McNeal had "repeatedly made Mary's need for her own home the only acceptable compensation." (*Id.*) The letter detailed the past financial gifts from Alberta McNeal to Michael McNeal and Michael's family and requested an explanation of Alberta McNeal's financial affairs. (*Id.*)

Subsequently, Maureen McNeal filed a special conservatorship proceeding in Hennepin County District Court, requesting that Michael McNeal be removed as trustee and also requesting an accounting of Michael McNeal's handling of the estate. (Michael McNeal Dep., Defendants' Exs. 1-3.) As a result, Alberta McNeal's long-time attorney Wheeler Smith was appointed as the Special Conservator for the estate and the parties engaged in discovery. The issues raised in the conservatorship proceeding focused especially upon the status of Alberta McNeal's three main assets: her homestead valued at $135,000; other real estate valued at $150,000 [an Illinois farm]; and other personal property valued at $250,000 [the revocable trust].

Apparently in response to this proceeding and Maureen McNeal's allegations, Michael McNeal attempted to clarify some of Alberta McNeal's financial matters in a letter to Maureen McNeal's attorney dated May 3, 1993. (Maureen McNeal Dep., Ex. 3.) In his letter, Michael McNeal stated, "It was decided and agreed upon that if we stayed and cared for mother that we would be given the Belmont [Avenue] House." (*Id.*)

Ultimately, the conservatorship proceeding was resolved by virtue of a Release and Settlement Agreement, signed on July 16 and 17, 1993, that divided Alberta McNeal's estate. (Michael McNeal Dep., Ex. 15.) The portions of the Release and Settlement Agreement relevant to this matter read as follows:

> WHEREAS, Michael and Mary have asserted certain claims against Alberta, her assets and her estate, including without limitation, that they are entitled to compensation for care they provided to Alberta during the period from 1985 through 1991; that Alberta transferred or intended to transfer the 12th Avenue house to Michael, Mary, and/or Corey and/or Mickey; and that Alberta transferred or intended to transfer the Illinois Farm to Corey and/or Mickey, which claims are denied by Maureen and Wheeler Smith.
>
> . . .

> On the Settlement Date, legal title to the 12th Avenue house shall be delivered to Corey by deed previously signed by Alberta individually and Michael as attorney-in-fact. Michael, Mary and Mickey specifically acknowledge that the conveyance to Corey serves as consideration to them as well as to Corey.
>
> . . .
>
> In consideration of the foregoing terms, Michael, Mary, Corey, and Mickey, for themselves, and for their successors and assigns, hereby agree to remise, release, acquit, and forever discharge Alberta, her successors, assigns, heirs, trustees, attorneys, and special conservators; Wheeler Smith; Gail Rising; First Bank National Association, as trustee of the Lloyd McNeal Trust; and Maureen and her successors, assigns, and heirs from all debts, demands, actions, suits, accounts, covenants, contracts, agreements, causes of action, damages, claims for services rendered or care provided, claims of gifts, and any and all other claims of every kind, nature, and description whatsoever, known or unknown, suspected or unsuspected, arising or alleging to have arisen, whether in law or in equity, including, without limitation of the foregoing, from any and all claims and/or potential claims for money paid to or on behalf of purchase made for or on behalf of, services rendered to or care provided to Alberta by Michael, Mary, Corey, and/or Mickey, gifts given or allegedly given by Alberta to Michael, Mary, Corey, and/or Mickey or moneys owed or allegedly owed by Alberta to Michael, Mary, Corey, and/or Mickey.

(*Id.* at 3, 4, 9-10.) The Release and Settlement Agreement was signed by Maureen McNeal, Corey McNeal, Michael McNeal and Mary [Dieter] McNeal (both individually and as guardians of Mickey McNeal), Alberta McNeal, and Wheeler Smith, as Special Conservator. (*Id.* at 11-14.)

The Order that approved the terms of the settlement stated as follows:

> Mary A. [Dieter] McNeal and Michael K. McNeal had a substantial claim against Alberta L. McNeal for services rendered in taking care of Alberta L. McNeal during the period from 1985 through 1991. This claim is being satisfied by conveying the former Alberta L. McNeal homestead at 4904 12th Avenue South, Minneapolis, Minnesota to Corey C. McNeal, son of Mary A. McNeal and Michael K. McNeal, and their designee to receive title to the property.

(Michael McNeal Dep., Ex. 16.)

The United States asserts that the 12th Avenue House was put in Corey McNeal's name only to avoid payment of back taxes[2] that had been assessed by the IRS against Mary Dieter and Michael McNeal–such back taxes that they could not pay. At the time that the Release and Settlement Agreement conveyed Alberta McNeal's house to Corey O'Tool, he was serving in the Air Force and stationed in Colorado. Furthermore, at the time that Corey O'Tool signed the Release and Settlement Agreement, he knew nothing about a lawsuit regarding his grandmother's estate, he was not a party to such a lawsuit, he had no claim against Alberta McNeal's estate, and he had no expectation that he would receive anything from Alberta McNeal's estate. (Corey O'Tool Dep. at 97-100.) Apparently, no other grandchild of Alberta McNeal received anything as part of this Release and Settlement Agreement. (*See, e.g.*, Mary Dieter Dep. at 93.) Michael McNeal has stated that "it was felt that by putting the property in [Corey O'Tool's] name, it might afford or offer us some protection from the IRS coming in and, and [sic] seizing the property or putting a lien against it or whatever your term would be." (Michael McNeal Depo. at 54.) In addition, Wheeler Smith has stated, "It was done because Michael asked that it be transferred to [Corey O'Tool], and I don't know if he said it, but my understanding was that Michael had tax liens and other obligations that if it went to him, that they could lay claim to the house, and so he didn't want to take title himself." (Wheeler Smith Dep. at 33.) Notably, Wheeler Smith also testified that Alberta never told him that she intended to transfer the house to Corey. (*Id.* at 47.)

---

[2] In 1989, taxes were assessed against Mary Dieter and Michael McNeal for failing to pay their taxes for 1979, 1980, 1981, 1982, and 1985. Such taxes resulted in an income tax liability of approximately $52,000. In addition, Mary Dieter and Michael McNeal were under an IRS audit in 1993 for their 1989 federal income taxes, such audit which ultimately resulted in an additional income tax assessment of $32,640.70. (See Michael McNeal Dep. Exs. 5, 17.)

## IV. Control over the 12th Avenue House

In conjunction with the United States' claims that the 12th Avenue House was transferred as compensation for Mary Dieter and Michael McNeal's services in taking care of Alberta, the United States asserts that Corey O'Tool held the 12th Avenue House as a nominee for Mary Dieter and Michael McNeal. The United States contends that Corey O'Tool owned the 12th Avenue House in name only, and that he failed to exercise any dominion or control over the property once the house was conveyed to him. Michael McNeal stated in his deposition testimony that the house was Corey O'Tool's in "name only." (Michael McNeal Dep. at 22.) Any decisions regarding the house were made by "whoever was living there at the time," Mary Dieter and Michael McNeal did not pay rent, and Mary Dieter and Michael McNeal were the named insureds on the house and paid for the homeowner's insurance, utilities, and were responsible for paying the property taxes. (*See* Corey O'Tool Dep. at 104; Michael McNeal Dep. at 57.) Michael McNeal and Mary Dieter continued paying all of the bills, even once the house was transferred to Corey O'Tool, in complete absence of any formal agreement. There were no real discussions about Mary Dieter and Michael McNeal paying rent to Corey O'Tool after the house was transferred to him; "[t]hey just continued living there." (Corey O'Tool Dep. at 104.) Finally, several court pleadings submitted as part of Mary Dieter's 1995 petition for divorce from Michael McNeal listed the 12th Avenue House as a marital asset. (*See* Mary Dieter Dep. at 110-112; *see also* Mary Dieter Dep. Exs. 21, 22, 23.)

Mary Dieter and Corey O'Tool contend that the household expenses paid by Mary Dieter and/or Michael McNeal constituted the "rent" paid to Corey O'Tool as part of an informal, verbal rent agreement. (*See* Mary Dieter Dep. at 95.) They assert that Corey O'Tool demonstrated his

dominion and control over the property by borrowing a home equity loan in 2000 by deciding to replace the house's carpeting with wood floors and by renting a bedroom to a college friend. Finally, Mary Dieter and Corey O'Tool assert that Mary Dieter's listing of the 12th Avenue House as a marital asset in her divorce pleading was merely "aggressive pleading" on the part of Mary Dieter's divorce attorney. (*See* Defendants Mary Dieter and Corey O'Tool's Memorandum of Law in Support of Their Motion for Summary Judgment and in Opposition to Plaintiff United States' Motion for Summary Judgment at 11.)

In 1997, when Corey O'Tool returned to Minneapolis upon completion of his military service, he lived in the 12th Avenue House and contributed to payment of the household expenses. (*See* Corey O'Tool Dep. at 115-21; Mary Dieter Dep. at 99.) At this same time, Mary Dieter had her paychecks deposited in Corey O'Tool's account and also had full authority to write and sign checks in Corey O'Tool's name. (*See* Corey O'Tool Dep. at 117-18.) Corey O'Tool believed that his mother did this because the IRS had "attached to one of her accounts, and she was afraid that, you know, every time she got money, they would just snag it, you know, every time, and then she wouldn't be able to make her car payment or anything like that." (*Id.* at 117.) In 2000, Hennepin County threatened to foreclose on the property due to nonpayment of Hennepin County property taxes. Although Corey O'Tool did not believe that these property taxes were his own debts, he took out a home equity loan to pay them, a loan which he later attempted, unsuccessfully, to assign to Mary Dieter. (*Id.* at 109-111; 126-27.) In addition, Corey O'Tool completed some home improvement projects with the money. (*Id.* at 122-24.) Unfortunately, Corey O'Tool did not enjoy these improvements, as he returned to San Antonio in

February 2001. Once he left, Mary Dieter made payments on the home equity loan and continued to live in the house. (*Id.* at 124.)

## V. Sale of the 12th Avenue House

In approximately September 2001, Corey O'Tool decided to sell the 12th Avenue House. (Corey O'Tool Dep. at 18-20.) The sale of the house was handled almost entirely by Mary Dieter, who had Power of Attorney to handle everything related to the sale. (*See* Corey O'Tool Dep. at 131; Gary Oslund Dep. at 17-18; Aff. of David Olson, Exs. I, K.) Neither Corey O'Tool nor Mary Dieter informed the real estate agent that the United States had brought suit to foreclose upon the 12th Avenue House in September 2001. (Gary Oslund Dep. at 20-21.) Moreover, although Corey O'Tool knew that there was a possibility that a tax lien had attached to the 12th Avenue House, neither he nor Mary Dieter notified the real estate agent of this possibility.[3] (*See* Corey O'Tool Dep. at 19; Gary Oslund Dep. at 29-32.) For whatever reason, the title search performed on the 12th Avenue House on October 16, 2001, did not reveal the tax lien.[4]

In reliance upon the assertions of Corey O'Tool and this seemingly clear title search, David and Juli Olson ("the Olsons") purchased the 12th Avenue House in December 2001 for $280,000.[5] The actual closing of the house was supposed to take place prior to November 14,

---

[3] On August 24, 1997, a Federal Tax Lien was filed to attach to the 12th Avenue House. (*See* Government Exhibit 8.) The lien was in the name of "Corey C. McNeal, Nominee of Michael K. and Mary A. McNeal," and listed tax assessments totaling $147,647.96. (*Id.*) The realtor knew that Corey McNeal had changed his name to Corey O'Tool. (Gary Oslund Dep. at 39-41.)

[4] It appears that a previous title search performed at the time of Corey O'Tool's home equity loan in 2000 did not reveal the tax lien, either.

[5] The Olsons knew neither of the tax lien encumbering the 12th Avenue House or the pending litigation in this matter until March 2002 and were ultimately served with a Second

2001; however, the closing was delayed because Mary Dieter had not vacated the 12th Avenue House. (Corey O'Tool Dep. at 148.)

On November 24, 2001, Corey O'Tool married Tina O'Tool. As a result of their marriage, although Tina O'Tool had never lived at the 12th Avenue House nor owned it, Corey insisted that Tina O'Tool sign some of the closing documents in order to allow the sale to proceed. (Tina O'Tool Aff. at ¶ 7.) Tina O'Tool executed these documents without reading the majority of them. (*Id.*) Tina O'Tool contends that although she knew about Mary Dieter's problems with the IRS, she believed, based upon the two title searches of the 12th Avenue House that revealed nothing in regard to tax liens, that Mary Dieter's tax problems did not affect the 12th Avenue House. (*Id.* at ¶ 8.)

Corey O'Tool and Tina O'Tool executed a Seller's Affidavit dated December 12, 2001, which stated:

> Corey Christopher O'Tool and Tina M. O'Tool, husband and wife being first duly sworn, on oath say(s) that:
>
> . . .
>
> (3) There have been no:
>
> . . .
>
> b. Unsatisfied judgments of record against the Person(s) nor any actions in any courts, which affect the Premises;
> c. Tax liens against said person(s).
>
> . . .

---

Amended Complaint joining them as parties to this action in September 2002. (*See* Aff. of David Olson at ¶13.)

> (5) Any judgments, or tax liens of record against parties with the same or similar names are not against the above named person(s).
>
> . . .
>
> Affiant(s) know(s) the matters herein stated are true and make(s) this Affidavit for the purpose of inducing the acceptance of title to the Premises.

(David Olson Aff. at Ex. D.) At closing, Corey and Tina O'Tool also delivered a Warranty Deed to the Olsons. (*Id.* at Ex. C.)

Corey O'Tool did not attend the closing on the house, but authorized the proceeds of the sale to be distributed by Mary Dieter. The $199,975.99 in proceeds were initially issued by a check made payable to Corey O'Tool, but such check was voided and reissued to Mary Dieter as attorney-in-fact for Corey O'Tool. (Affidavit of Denise Crosley at Ex. E.) Of these proceeds, it appears that approximately $62,000 was given as a gift from Corey O'Tool to John and Theresa Dieter, Mary Dieter's parents. Although he appears to have played no part in the decision as to the amount, Corey O'Tool stated that it was his own idea to use the sale proceeds as a gift because he knew that his mother could not own a home in her own name. (Corey O'Tool Dep. at 53-58.)

Consequently, the sale proceeds passed through Mary Dieter to John and Theresa Dieter for their down payment on the purchase of the house that Mary Dieter currently lives in at 6114 Elliot Avenue South in Minneapolis (the "Elliot Avenue House"). Mary Dieter asked John and Theresa to purchase the Elliot Avenue House for her. (Mary Dieter Dep. at 129.) Admittedly, Mary Dieter did not purchase the Elliot Avenue House herself because of the tax liens involving

her name. (*See* Mary Dieter Dep. at 128.)[6] Mary Dieter had Power of Attorney from her parents to make the purchase of the Elliot Avenue House and she, not John and Theresa Dieter, attended the settlement for purchase of the Elliot Avenue House. (*See id.* at 128-29.) Mary Dieter currently makes all of the payments for mortgage, utilities, homeowner's insurance, and property tax payments on the Elliot Avenue House. (Theresa Dieter Dep. at 31-33.)

Approximately $138,000 of the remaining proceeds from the sale of the 12th Avenue House went to Corey O'Tool. (*See* Mary Dieter Dep. at 127.) Tina O'Tool asserts that she has had no access to any of the funds that Corey O'Tool received as proceeds from the sale of the 12th Avenue House. (Dep. of Tina O'Tool at ¶ 9.)

## Discussion

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and

---

[6] The United States also asserts that Theresa Dieter admitted that Mary Dieter asked her and her husband to purchase the property because Mary Dieter could not have the house in her name due to problems with the IRS. (*See* Plaintiff United States' Memorandum of Law in Support of Motion for Summary Judgment at 17.) While this assertion appears to be undisputed, the United States did not include the cited excerpt of Theresa Dieter's deposition in the record.

inexpensive determination of every action.'" Fed. R. Civ. P. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

## II. The United States of America's Motion for Summary Judgment

The United States of America brings its motion for summary judgment on three specific issues. First, The United States asserts that the tax assessments against Mary Dieter and Michael McNeal should be reduced to judgment. Second, the United States asserts that Mary Dieter and Michael McNeal received the 12th Avenue House as compensation for their services in caring for Alberta McNeal, and that the house was merely put in Corey O'Tool's name to prevent the IRS from foreclosing on the property in order to satisfy the tax assessments. Third, the United States asserts that the Court should order the sale of the 12th Avenue House to satisfy Mary Dieter and Michael McNeal's outstanding tax liens. Mary Dieter and Corey O'Tool oppose the United States of America's position on the first and second of these issues, and move for summary judgment on the same.

**A. Reducing the Tax Assessments to Judgment**

The United States has submitted Certificates of Assessments and Payments for Mary Dieter and Michael McNeal and seeks to reduce the assessments to judgment. The tax assessments were made for unpaid federal income taxes of Michael McNeal from the years 1989 and 1993 and for Mary Dieter for 1993. The 1993 assessments were based upon the premise that Mary Dieter and Michael McNeal received the 12th Avenue House as compensation for their services of taking care of Alberta McNeal, and that Corey O'Tool merely received the house as a nominee.

For purposes of summary judgment, IRS Certificates of Assessments and Payments submitted by the United States are sufficient evidence of the validity of the federal tax assessments. *United States v. Gerads*, 999 F.2d 1255, 1256 (8th Cir. 1993), *cert. denied*, 510 U.S. 1193 (1994); *see also United States v. Langert*, 902 F. Supp. 999, 1002 (1995). Once submitted, the burden shifts to the taxpayer to prove that the assessments are erroneous. *Kiesel v. United States*, 545 F.2d 1144, 1146 (8th Cir. 1976). Here, the United States has submitted official Certificates of Assessments and Payments for Mary Dieter and Michael McNeal. Michael McNeal did not respond to the Complaint, and has not further questioned the validity of these assessments. (*See* Court Doc. No. 8, entering default judgment against Defendant Michael McNeal.) Mary Dieter and Corey O'Tool, however, challenge the assessments. They assert that although the transfer of the 12th Avenue House to Corey O'Tool occurred as part of a settlement of the special conservatorship proceeding between Michael McNeal and Maureen McNeal, the nature of the transfer was that of a testamentary disposition of Alberta McNeal's assets to her

grandson, Corey O'Tool. Thus, they assert that the gift or bequest was exempt from federal income tax pursuant to Internal Revenue Code § 102.

Because of this dispute, the Court must first determine whether Mary Dieter received the 12th Avenue House as compensation for services and whether Corey O'Tool received the house as a nominee in order to determine whether the Court can reduce the Federal income tax assessments to judgment.

### 1. Compensation for Services

The Internal Revenue Code defines "gross income" as "all income from whatever source derived," including "compensation for services." 26 U.S.C. § 61(a). While it appears to be well-settled that compensation received for providing attendant-care services to a family member is properly included in gross income for federal income tax purposes,[7] the question remains as to whether the 12th Avenue House was indeed transferred as compensation for Mary Dieter and Michael McNeal's services in caring for Alberta McNeal.

Here, Dieter provided full-time care for Alberta McNeal over a six-year period, assisting in bathing her, handling her financial matters, cooking, cleaning, and providing transportation. During that time, it Mary Dieter and Michael McNeal expected that they would receive Alberta's home as compensation for caring for her, and they discussed this with Alberta McNeal and with Michael McNeal's sister, Maureen. While Mary Dieter asserts that no fixed agreement occurred to effect this plan, Mary Dieter has simply not provided any evidence to contradict the United States' assertion that this was the family's intent.

---

[7] *See, e.g., Goldman v. United States*, 79 F. Supp. 2d 1356 (N.D. Ga. 1998), *aff'd* 196 F.3d 1262 (11th Cir. 1999); *Baldwin v. Comm'r of Internal Revenue*, T.C. Memo 2000-306 (2000); *Bannon v. Comm'r of Internal Revenue*, 99 T.C. 59 (1992).

Most telling, however, is the settlement of the special conservatorship proceeding in 1993. The Release and Settlement Agreement from that proceeding clearly stated that the house was being transferred in consideration for a release of the claims that Michael McNeal and Mary Dieter had against Alberta, "including without limitation, that they are entitled to compensation for care they provided to Alberta during the period from 1985 through 1991." Indeed, the Order approving the settlement stated that the transfer of the house was in satisfaction of Mary Dieter and Michael McNeal's "substantial claim" against Alberta McNeal for services rendered in caring for her, such claim that was being "satisfied by conveying [the 12th Avenue House] to Corey McNeal." While this is not dispositive of the issue, Mary Dieter and Michael McNeal did not object to that Order.

Other than their bare assertions that this was done as part of Alberta's testamentary disposition, Mary Dieter and Corey O'Tool have provided nothing to the Court to demonstrate that this was a gift, made out of "detached or disinterested generosity." *See Comm'r of Internal Revenue v. Duberstein*, 363 U.S. 278, 285 (1960). The 12th Avenue House was not conveyed specifically as part of a will or trust; in fact, neither Alberta McNeal's will nor her trust specifically mentioned this disposition of her house, especially a disposition of her house to Corey O'Tool.

The Court also does not find persuasive Mary Dieter's arguments that even if she received the 12th Avenue House as compensation for services, that she was overpaid for her services and thus should not be assessed income taxes based upon the value of the 12th Avenue House. Considering that this amount was assessed to Mary Dieter and Michael McNeal almost ten years ago, this argument is rejected as untimely. The express agreement of the parties was

such that Mary Dieter and Michael McNeal received the entire 12th Avenue House as compensation for their services. The Court is not willing to reopen the valuation of the transfer when this issue was decided as part of the settlement agreement ten years ago and has remained unchallenged until this time.

The Court concludes that there is no genuine issue of material fact that the 12th Avenue House was transferred as compensation for Mary Dieter and Michael McNeal's services in taking care of Alberta McNeal. Thus, summary judgment is granted in favor of the United States on this issue.

**2. Corey O'Tool as Nominee**

The United States asserts that Mary Dieter and Michael McNeal attempted to avoid the tax consequences of the transfer of the 12th Avenue House to them by putting the property in Corey O'Tool's name, and that Corey O'Tool owned the house in name only. Mary Dieter and Corey O'Tool, on the other hand, contend that Corey O'Tool asserted substantial control over the 12th Avenue House to establish that the United States' claim that Corey O'Tool was a mere nominee should fail.

"The government may collect the tax debts of a taxpayer from assets of the taxpayer's nominee, instrumentality, or alter ego." *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999) (*citing G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51(1977)). In analyzing whether an individual holds property as the taxpayer's nominee, courts have looked to factors that include whether the individual treated the asset as his own, whether the individual carried insurance in his own name, whether the individual paid consideration for the property, and

whether the individual was closely related to the taxpayer. *See Loving Saviour Church v. United States*, 728 F.2d 1085(8th Cir. 1984).

Corey O'Tool, Mary Dieter, and Michael McNeal were closely related. Corey O'Tool paid no consideration for the 12th Avenue House. Corey O'Tool had no claim to Alberta McNeal's estate and was not even a party to the special conservatorship proceeding that resulted in the Release and Settlement Agreement. As discussed above, there has been no evidence presented to the Court, other than bare assertions of the parties, that this property was given to Corey O'Tool as a mere gift or as part of Alberta's testamentary disposition. In fact, Michael McNeal admitted that the house was put in Corey O'Tool's name to "afford or offer us some protection from the IRS coming in and, and [sic] seizing the property or putting a lien against it."

Moreover, Corey O'Tool's dominion and control over the property was minimal. Even once the 12th Avenue House was conveyed to Corey O'Tool, Mary Dieter and Michael McNeal continued to run the house as their own. While Corey O'Tool asserts that Mary Dieter and Michael McNeal rented the 12th Avenue House by virtue of an informal, verbal rental agreement, there is nothing to support this assertion. Mary Dieter and Michael McNeal resided in the house rent-free and controlled all of the debts regarding the house. In fact, when Corey O'Tool took out a home equity loan to pay off the delinquent property taxes with Hennepin County, he even attempted to assign the loan to his mother, as he did not believe that those debts were his own. All of the utilities and insurance at the house were in Mary Dieter's name. Ultimately, Mary Dieter took charge of nearly all aspects of the sale of the home to David and Juli Olson and retained a significant portion of these proceeds for the purchase of the Elliot Avenue house in which she currently resides.

In light of the overwhelming evidence demonstrating that Corey O'Tool did not treat the 12th Avenue House as his own, and considering the Court's previous finding that the house was transferred to Mary Dieter and Michael McNeal as compensation for services, the Court concludes that there is no genuine issue of material fact as to the issue of whether Corey O'Tool acted as a nominee for Michael McNeal and Mary Dieter. Because there is no genuine issue of material fact as to these issues, the federal tax assessments are valid. Thus, a lien arises under 26 U.S.C. § 6321 in favor of the United States for the value of the 12th Avenue House at the time of the conveyance to Mary Dieter and Michael McNeal. *See, e.g., United States v. Langert*, 902 F. Supp. 999, 1004 (D. Minn. 1995), *citing United States v. Solheim*, 953 F.2d 379, 382 (8th Cir. 1992).

**B. Satisfaction of the Outstanding Tax Liabilities**

As noted above, the United States filed tax liens and a notice of *lis pendens* with the Hennepin County Recorder before David and Juli Olson purchased the property on December 14, 2001. The United States asserts that because the tax liens continued to attach to the 12th Avenue House even after the subsequent transfer to David and Juli Olson, the United States is entitled to a Court-ordered sale to satisfy Mary Dieter and Michael McNeal's tax liabilities. The Olsons have not specifically objected to the forced sale of the property in order to satisfy the tax liens.

Section 7403 of the Internal Revenue Code authorizes the Court to order a sale of property in which a delinquent taxpayer has an interest in order to satisfy that taxpayer's debt, even though an innocent third party may have an interest in the property, so long as the innocent third party receives compensation. *See United States v. Bierbauer*, 936 F.2d 373, 374 (8th Cir.

1991). The *Bierbauer* court rejected the district court's decision to not allow the government to satisfy its tax lien because of the likely prejudice to the innocent third party owner. *Id.* In so holding, the court addressed four factors to be considered in § 7403 proceedings involving property held by a delinquent taxpayer and a non-liable third party. *Id.* First, the court looks to "'the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes.'" *Id., quoting United States v. Rodgers*, 461 U.S. 677, 709-10 (1983). Specifically, the *Bierbauer* court looked to whether the government could satisfy its tax lien with a forced sale of the delinquent taxpayer's partial interest, rather than by selling the whole interest. *Id.* at 376. Second, the Court looks to whether the third party has a "legally recognized expectation" that their property would not be subject to a forced sale by the delinquent taxpayer or that person's creditors. *Id.* Third, the court considers the possibility of undercompensation and the extent of personal dislocation costs to the third party. Finally, the court compares the character and value of the interests in the property.

These factors all weigh in favor of a Court-ordered forced sale of the 12th Avenue House to satisfy the outstanding tax liens against Mary Dieter and Michael McNeal. As to the first factor, the Court cannot separate the Olsons' interest from that of Mary Dieter and Michael McNeal. Without a forced sale of the entire property, the government cannot satisfy its tax liens. Second, the Olsons purchased title insurance on the property, protecting their property interest in the event that the title search was incorrect. Third, because of the Olsons' title insurance and their ability to seek relief based upon their own claims against Corey O'Tool, Tina O'Tool, Mary Dieter, and John and Theresa Dieter, the Court finds that the Olsons are not likely to be

undercompensated as a result of the foreclosure. Finally, the fourth factor weighs in the government's favor. While the Olsons have a fee interest in the property, the forced sale will likely result in the government netting a significant portion of the property value, considering the large amount of federal income taxes that were assessed. Thus, there is good reason for the Court to allow the forced sale of the property.

In so holding, the Court wishes to make clear that David and Juli Olson were entirely innocent of any wrongdoing here. It appears to the Court that the failure to determine the existence of the tax liens on the property is attributable to Hennepin County's derelictions of duties, the title company's failure to uncover the tax liens, or the misrepresentations made by Corey O'Tool regarding the status of title to the 12th Avenue House. Unfortunately, that is probably of no consolation to the Olsons, who will now be displaced from their home. By holding in favor of the United States on this issue, the Court intends there to be no undue prejudice or adverse implications to the Olsons. Specifically, to the greatest extent possible, the Court demands that the United States make every effort to protect the Olsons from any adverse credit rulings as related to the potential forced sale of the property. Indeed, it appears to the Court that if, as the government has suggested, the parties attempt some kind of settlement or reconciliation of this matter that does not require a forced sale, it may result in a less onerous burden on the Olsons.

## III. David and Juli Olson's Motions for Summary Judgment

David and Juli Olson move for summary judgment on their cross-claims against Corey O'Tool and Mary Dieter based upon breach of the warranties of title, fraud, unjust enrichment, and fraudulent transfer. As part of these cross-claims, the Olsons seek the imposition of a

constructive trust, attachment of both the Elliot Avenue Property and the proceeds from the sale of the 12th Avenue House, and other remedies. In addition, the Olsons seek summary judgment on their claims against Tina O'Tool and John and Theresa Dieter for breach of warranties of title, fraud, unjust enrichment, and fraudulent transfer. For these claims, the Olsons seek similar relief. Corey O'Tool, Tina O'Tool, Mary Dieter, John Dieter, and Theresa Dieter oppose these motions and move for summary judgment on the same.

Before the Court can address the individual claims that the Olsons have against the various parties, the Court must first address Corey O'Tool's contentions that by virtue of the arbitration agreement that the Olsons signed, the Olsons must submit their claims to binding arbitration rather than having them adjudicated in this Court. In so asserting, Corey O'Tool relies upon the provision in the Purchase Agreement which states, "Any dispute between the undersigned parties, or any of them, ***about or relating to the physical condition of the property*** covered by the purchase agreement dated 10/16/01, including claims of fraud, misrepresentation, warranty and negligence shall be settled by binding arbitration." (*Emphasis added.*) Only Corey O'Tool and the Olsons signed the Purchase Agreement, not any of the other parties against whom the Olsons have brought motions. Thus, the only party that the Olsons could possibly be mandated to arbitrate its claims against is Corey O'Tool. However, none of the Olsons' claims relate to the "physical condition" of the 12th Avenue House; rather, the Olsons' claims arise out of the representations that were made regarding the legal status of the title to the 12th Avenue House. Because the agreement to arbitrate did not clearly contemplate the resolution of issues aside from the physical condition of the house, the Court still retains jurisdiction over these

claims. Corey O'Tool and Mary Dieter's Motion for Summary Judgment on this matter is denied.

### A. False Representations

The Olsons assert that Corey O'Tool and Tina O'Tool intentionally and fraudulently misrepresented the status of the 12th Avenue House when they submitted the Affidavit Regarding Seller(s) to the Olsons, and thus that the Olsons are entitled to summary judgment on this issue.

Under Minnesota law, a person is liable for fraudulent misrepresentation

> if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, to his pecuniary damage.

*Swanson v. Domning*, 86 N.W.2d 716, 720 (Minn. 1957). Here, Corey O'Tool admitted in his deposition that he knew about the possibility of the tax lien prior to executing the Affidavit Regarding Seller(s). While he states that he relied upon the two erroneous title searches in forming his answers to the questions on that form, he had indeed been served with papers in this suit and his lawyer had prepared an answer on his behalf which was submitted on November 5, 2001, more than one month prior to the closing of the 12th Avenue House. Thus, when Corey O'Tool stated in the Affidavit Regarding Seller(s) that there were no "actions in any courts which affect the Premises," he knew, or at least was susceptible of knowing, that this statement was false. The fact that he informed his realtor of the possibility of a tax lien is not enough to absolve him of liability to the Olsons–he simply should have informed the Olsons of that possibility and not misstated his knowledge on the Affidavit Regarding Seller(s).

The Olsons relied upon this misrepresentation in closing on the 12th Avenue House. This reliance caused damages in the form of the impending forced sale of the house and the attorney fees that they have incurred in defending this suit, not to mention the chaos and uncertainty that this has created in their lives. Because no genuine issue of material fact exists as to Corey O'Tool's misrepresentation, and because the Olsons' relied upon this misrepresentation and it caused damages, summary judgment in favor of the Olsons is granted on this issue.

Regarding Tina O'Tool, however, the Court finds that there is a genuine issue of material fact as to her knowledge of the tax liens on the property. Tina O'Tool became involved in the sale of the 12th Avenue House only by virtue of the closing delay and her marriage to Corey O'Tool just days before the closing. Because Corey O'Tool had homesteaded the property, Tina O'Tool was legally required to sign the paperwork in order to effect the sale of the 12th Avenue House. *See* Minn. Stat. § 507.02 (2002). However, Tina O'Tool has asserted that she had no personal knowledge of the tax liens. To the extent that she read any of the paperwork that she signed for the closing, she appears to have relied upon the representations of the two title searches in signing the Affidavit Regarding Seller(s). Based upon these assertions, the Court finds that a genuine issue of material fact exists as to whether Tina O'Tool knew or was capable of knowing of the tax liens when she represented to the Olsons that there were no liens or actions related to the property. Thus, the Olsons' motion for summary judgment as to Tina O'Tool is denied on this issue.

### B. Breach of Warranty of Title

The Olsons assert that Corey O'Tool and Tina O'Tool breached the warranties of title by delivering a Warranty Deed to the Olsons that contained no exceptions, thus warranting that the

12th Avenue House was free of all encumbrances and further warranting the quiet and peaceful possession of the property.

Minnesota Statutes provide:

> In all conveyances by deed or mortgage of real estate upon which any encumbrance exists, the grantor, whether executing the same in the grantor's own right, or as executor, administrator, assignee, trustee, or otherwise by authority of law, shall, before the consideration is paid, by exception in the deed or otherwise, make known to the grantee the existence and nature of such encumbrances, so far as the grantor has knowledge thereof.

Minn. Stat. § 507.20 (2002).

As discussed above, the United States has successfully asserted and defended the validity of its tax liens on the subject property. These encumbrances existed at the time that Corey O'Tool delivered the Warranty Deed, without exceptions, to the Olsons. As a result, the Olsons have incurred substantial damages, including attorney fees and the potential forced sale of their house. As stated above in the Court's discussion of fraudulent misrepresentation, Corey O'Tool had been served notice of the lawsuit against him over one month prior to the time that he delivered the warranty deed, without exceptions, to David and Juli Olson. This action was clearly in breach of the warranties of title. Thus, David and Juli Olson's motion for summary judgment against Corey O'Tool on this issue is granted.

Tina O'Tool asserts that she is not liable to the Olsons on their claims of breach of warranties of title because she signed the deed as an accommodation party only. Two Minnesota cases support her assertions. In *McDermott v. Ralich*, the Minnesota Supreme Court held that there could be no recovery for fraud against a spouse when she merely participated in signing a deed in order to bar her inchoate spousal interest in the property, she participated in none of the

negotiations for the sale, she did not receive the purchase money, and she did not own and could not convey an interest in the lot. 247 N.W. 683, 686 (Minn. 1933). This holding was more recently affirmed by the Minnesota Court of Appeals in *Knopff v. Olson*, 1995 WL 497275 at *3-4 (wife cannot be liable for rescission and restitution awarded when she did not have an ownership interest in the property sold, did not participate in the misrepresentations that prompted the purchase, and did not receive any of the purchase money).

Here, the Court finds that Tina O'Tool did not have an ownership interest in the property and, like the spouses in *Knopff* and *McDermott*, she signed the closing paperwork only due to her inchoate spousal interest in the property that arose only about two weeks prior to the closing. In addition, Tina O'Tool asserts that she did not participate in any misrepresentations because she relied upon the two clean title searches, much like the Olsons. As previously noted, a genuine issue of material fact exists as to Tina O'Tool's knowledge of the fraudulent misrepresentations to the Olsons. Finally, Tina O'Tool contends that she did not receive any consideration for the sale of the property. The Court finds that there is still a question of fact as to whether Tina O'Tool had or has access to proceeds from the sale of the 12th Avenue House. Even if she has no access to any of those proceeds directly, Tina O'Tool may have benefitted by virtue of her husband's increased assets from the sale. Because a genuine issue of material fact exists as to these issues, however, the Olsons' motion for summary judgment against Tina O'Tool is denied.

### C. Unjust Enrichment/Constructive Trust

David and Juli Olson assert that Corey O'Tool, Tina O'Tool, Mary Dieter, and John and Theresa Dieter have been unjustly enriched by their fraudulent conduct regarding the sale of the 12th Avenue House to the Olsons. Specifically, the Olsons point to false statements made to

them that can be traced to John and Theresa Dieter's purchase of the Elliot Avenue House with sale proceeds from the sale of the 12th Avenue House. Such purchase, the Olsons contend, benefitted Corey O'Tool with sale proceeds, benefitted Mary Dieter with a place to live, and benefitted John and Theresa by providing them with equity in the Elliot Avenue House.

To establish a cause of action for unjust enrichment, it must be shown that a party has "knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit its retention." *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992); *see also Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). Because unjust enrichment is an equitable remedy, one may not seek it when there is an adequate remedy at law. *Southtown Plumbing, Inc.*, 493 N.W.2d at 140.

Although it appears to the Court that Corey O'Tool has satisfied all of the elements necessary to justify a claim of unjust enrichment, the Olsons already have an adequate legal remedy against him. Specifically, the Court has found that there is no genuine issue of fact as to Corey O'Tool's liability to the Olsons for breach of warranties of title in transferring the Warranty Deed, without exceptions, when the United States had validly asserted tax liens on the 12th Avenue House. Thus, no action for unjust enrichment lies against Corey O'Tool and the Olsons' motion for summary judgment is denied in this regard.

As to Tina O'Tool, the Court found that it cannot conclusively prove that she received anything of value from the sale of the 12th Avenue House. She asserts that she had no access to the proceeds from the sale of the 12th Avenue House. Thus, because a genuine issue of material

fact exists as to her receipt of the proceeds, the Olsons motion for summary judgment on this issue is denied.

The Court concludes, however, that the Olsons are entitled to relief on their claim of unjust enrichment as to Mary Dieter and John and Theresa Dieter. Ultimately, John and Theresa Dieter used approximately $62,000 of proceeds from the sale of the 12th Avenue House, a purported gift from Corey O'Tool, to purchase the Elliot Avenue House for Mary Dieter to live in. This house is titled to John and Theresa Dieter, and they apparently will retain the equity in it. Mary Dieter admits that she did not purchase the Elliot Avenue House herself because of the tax liens involving her name. While it appears to the Court that John and Theresa Dieter may be entirely innocent of any bad faith or wrongdoing in this matter, and that they merely trusted their daughter, the Court finds that it would be unjust to allow Mary Dieter or John and Theresa Dieter to retain the proceeds from the sale of the 12th Avenue House, when such sale was induced by Corey O'Tool's misrepresentations. The Court has no other legal remedy by which to protect the Olsons from this unjust enrichment. Thus, the Olsons' motion for summary judgment against Mary Dieter and John and Theresa Dieter is granted in this regard.

The Olsons have requested that the Court impose a constructive trust on the proceeds that stem from the fraudulently obtained sale of the 12th Avenue House, as such proceeds are traceable from Corey O'Tool's wrongful conduct regarding the sale of the 12th Avenue House to the purchase of the Elliot Avenue House. In addition, the Olsons seek a constructive trust on the proceeds from the sale of the 12th Avenue House, at least a portion of such proceeds which allegedly remain in Corey O'Tool's bank account.

The constructive trust is "a flexible remedy, appropriate 'where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.'" *Rock v. Hennepin Broadcasting Associates, Inc.*, 359 N.W.2d 735, 739 (Minn. Ct. App. 1984), *citing Knox v. Knox*, 25 N.W.2d 225, 228 (Minn. 1946) and *quoting* Restatement of Restitution § 160, at 640-41 (1937). Fraud need not be present to impose a constructive trust, but rather there must be "clear and convincing evidence that the imposition of the constructive trust is justified to prevent unjust enrichment." *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn. 1983).

Here, the Court finds that such clear evidence exists to justify the imposition of a constructive trust. Mary Dieter and John and Theresa Dieter have been unjustly enriched by receiving the proceeds of the 12th Avenue House. These funds are directly traceable from Corey O'Tool's misconduct regarding the sale of the 12th Avenue House to the purchase of the Elliot Avenue House. Mary Dieter and John and Theresa Dieter gave Corey O'Tool no consideration in exchange for this money. To prevent injustice to the Olsons and to protect the Olsons' interest, Mary Dieter and John and Theresa Dieter should not be allowed to retain or dispose of the product of these sale proceeds. Thus, a constructive trust is an appropriate measure to secure the traceable sale proceeds until the amount of damages to the Olsons can be resolved.

**D. Fraudulent Transfer**

Finally, the Olsons assert that the actions of Corey and Tina O'Tool, Mary Dieter, and John and Theresa Dieter amount to a fraudulent transfer pursuant to Minnesota Statutes § 513.44. That statute provides as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . .
>
> (b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44 (2002). The Olsons assert that the fraudulent transfer was made when Corey O'Tool and Mary Dieter sold the 12th Avenue House and subsequently converted the proceeds into the Elliot Avenue House, titled to John and Theresa Dieter, with actual intent to defraud the United States and the Olsons.

The Court finds that a genuine issue of material fact exists as to whether Corey O'Tool and Mary Dieter specifically intended to defraud creditors when they transferred the proceeds of the 12th Avenue House to John and Theresa Dieter in order to purchase the Elliot Avenue House. Corey O'Tool has stated that he intended this transfer to be a gift to his mother. While the Court

may speculate about Corey O'Tool and Mary Dieter's real motive, such speculation or questioning of credibility are insufficient bases on which to grant summary judgment. Furthermore, as the Court has already provided for relief to compensate the Olsons, such a remedy is unnecessary. Thus, the Olsons' motion is denied.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. The United States of America's Motion for Summary Judgment (Doc. No. 47) against Mary Dieter and Corey O'Tool is **GRANTED** as follows:

a. The federal individual income tax assessments made against Mary Dieter are valid;

b. The United States is entitled to judgment as a matter of law against Mary Dieter for the year 1993;

c. The United States' tax liens are valid and attached to the real property which is legally described as Lot 2, Block 11, Shenandoah Terrace, Hennepin County, Minnesota, and located at 4904-12th Avenue South, Minneapolis, Minnesota (hereinafter "the Property");

d. Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce those liens against the Property in order to satisfy the tax liabilities of Mary Dieter and Michael McNeal;

2. Mary Dieter and Corey O'Tool's Motion for Summary Judgment against the United States of America (Doc. No. 51) is **DENIED**;

3. David and Juli Olson's Motion for Summary Judgment (Doc. No. 36) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

a. David and Juli Olson's Motion for Summary Judgment against Corey O'Tool on the issue of fraudulent misrepresentation is **GRANTED**;

b. David and Juli Olson's Motion for Summary Judgment against Corey O'Tool on the issue of breaches of warranty of title is **GRANTED**;

c. David and Juli Olson's Motion for Summary Judgment against Tina O'Tool on the issue of fraudulent misrepresentation is **DENIED**;

d. David and Juli Olson's Motion for Summary Judgment against Tina O'Tool on the issue of breach of warranties of title is **DENIED**;

e. David and Juli Olson's Motion for Summary Judgment against Corey O'Tool and Tina O'Tool on the issue of unjust enrichment is **DENIED**;

f. David and Juli Olson's Motion for Summary Judgment against Mary Dieter, John Dieter, and Theresa Dieter on the issue of unjust enrichment is **GRANTED**;

g. David and Juli Olson's Motion for Summary Judgment against Corey O'Tool, Tina O'Tool, Mary Dieter, John Dieter, and Theresa Dieter on the issue of fraudulent transfer is **DENIED**;

h. David and Juli Olson's Motion for Summary Judgment against Corey O'Tool, Tina O'Tool, Mary Dieter, John Dieter, and Theresa Dieter on the issue of constructive trust is **DENIED** as to Corey O'Tool and Tina O'Tool and **GRANTED** as to Mary Dieter, John Dieter, and Theresa Dieter;

4. Mary Dieter and Corey O'Tool's Motion for Summary Judgment against David and Juli Olson (Doc. No. 60) is **DENIED**;

5. Tina O'Tool, John Dieter, and Theresa Dieter's Motion for Summary Judgment against David and Juli Olson (Doc. No. 40) is **DENIED**;

6. David and Juli Olson are entitled to a constructive trust on the property located at 6114 Elliot Avenue South in Minneapolis, Minnesota;

7. Corey O'Tool is directed to escrow any remaining proceeds from the sale of the Property located at 4904 12th Avenue South in Minneapolis. Such funds shall be held in escrow until the amount of damages incurred by David and Juli Olson is determined, including the amount of reasonable attorney fees and costs. The Court assumes that the parties can agree on the manner in which the amount of damages shall be determined; in the event that they cannot agree, the parties should contact the Court's calendar clerk, Lowell Lindquist, at 651/848-1296, to determine an appropriate manner in which to resolve this issue;

8. The Court assumes that if the parties would benefit from the use of the Magistrate Judge in settling all issues consistent with this Order, that the parties will contact Magistrate Judge Arthur Boylan's calendar clerk, Kathy Thobe, at 651/848-1210, to schedule a settlement conference.

Dated: April 11, 2003

DONOVAN W. FRANK
Judge of United States District Court